The next case is 23-4040, United States v. Miffin. And whenever counsel are ready, we'll hear from you. Mr. Pickens. Good morning, your honors. I'm Scott Pickens. I represent Germaine Johnson. My co-counsel, Timothy McCormick, represents Rudolph Miffin in this appeal. There are basically two issues before the court from our perspective. One has to do with the search of Mr. Johnson and the propriety of that search. The other has to do with the aspects of search of the vehicle. The trial court found that the vehicle search without a warrant was improper, but it was saved by the doctrine of inevitable discovery. Mr. McCormick will be addressing that facet of the appeal. As with many of the criminal cases before this court, facts matter. And I spent some time in the briefs directing the court to specific portions of the body cameras that were admitted into evidence, those of Officer Broaddus and those of Sergeant English. What I think is abundantly clear is that there's a bit of a contrast between some of the testimony at the suppression hearing versus what's on the body camera video. And I think because we have literally a front row seat to watch what happened through the body cam, that's going to be the more accurate retelling of what happened. You seem to suggest that in the briefing. Can you give me an example of what you're referring to? Well, for instance, Your Honor, in the factual scenario in the testimony, Officer Broaddus goes into talking about officer safety and trying to justify his fears, reasonable fears, attended to the traffic stop. And he goes on at length about that. And the courts have acknowledged that there is an inherent safety issue, although Justice Scalia and Gantt tended to downplay that and said that when there's a minor traffic infraction, the risk of harm. I know, but I'm trying to get at what you think the difference is between the two, just to go back. I mean, I don't think Scalia's got a view on the difference here. So what's the difference between what's on the video and what the testimony was? Well, I mean, you're asking us to sort of disregard officer's testimony. Yes, sir. What is inconsistent in the video that- Officer Broaddus goes into how concerned he was when Officer English, Sergeant English, said he saw body movement and then went over to the vehicle while Officer Broaddus is still sitting in his car. What you see on the video is that Sergeant English goes up to the car to investigate and he stays there. And it apparently seems to be engaging in a conversation. There's never a call back to Officer Broaddus. Hey, there's a problem here. I need your help right now. By the same token- But why is that inconsistent? I don't know. I just don't understand that. Why is that inconsistent? Because- He's concerned about officer's safety. But he engages them in conversation, right? This is like law enforcement 101, de-escalation, right? Talk to them, like don't- Like human beings. Right, which is what people do. So why is that undercut their testimony is what I'm getting at. Their testimony was, the tenor of their testimony was, we're in fear of our safety. We weren't sure what was going on, what was happening, why there was movement in the car. So we were on heightened vigilance. But when you watch the video, you see that when Broaddus comes up to the car, he recognizes Mr. Johnson and he's chuckling. Hey, didn't I just talk to you a few minutes ago? And in fact, during part of the body cam- Wait, but why does that, so why does that, like engaging with another human being in a civil and engaging manner reflect that he cannot have a fear for his officer's safety? Because if English is in fear for his safety, because he sees movement in the car. And I don't disagree that there are cases replete with facts where movement in a car is observed and the officers fear for their safety and check those things out. And sometimes their suspicions are confirmed, sometimes they are not. But here, the stop was for a table light, a license plate reader light that was out. And when- Can you just, I just want to understand, is there something else beyond what you've told us that suggests in the video that's inconsistent with the testimony? Because everything, when I watch the video and I read the testimony, they don't seem inconsistent to me. I think where the inconsistencies come in, Judge Richardson, is where there is justifications such as, for instance, and the government says, re-quoting Broadus, that Johnson shouted, hey, they got the Glick, they found the Glick. But when you watch the video, he's conversing, Johnson is conversing with the officers as when they searched the bag. And he does say they found the Glick, but he's not shouting and jumping up and down and yelling at the top of his lungs. It's still part of the conversational tone. I think the difference is point three. When you watched that, did you think that he was not trying to convey it to Mr., is it Miffin? Miffin. I mean, it seems like to me, he's not talking to the officer. He may have. If God just tell the officer, they, meaning you, found my gun. Right. Right, he's trying to tell the guy in the car that they found my Glock. He may have, but when you watch Officer Holmes' video, you don't even hear that. And Holmes is standing right there with Mr. Miffin. Miffin is at the car, and then later Officer Holmes removes Miffin from the car, and they're standing off to the side after Holmes pats down Miffin. But you don't even hear Mr. Johnson say, they found the Glick. That's not, so if you can't even hear that from Holmes' body cam when he's standing right next to Miffin the whole time, how is that shouting? Again, it's a matter of degree. How does this shouting point help you? That's kind of after the pat down, it's after everything. I think it's totally irrelevant. You want to move on to something that's relevant? Be happy to. When Mr. Johnson exited the vehicle and brought us started to do a pat down, again, we would submit that there was no basis for the pat down. A pat down only happens, it's supposed to only happen when the officers are in reasonable fear for their safety. And I would submit that there was nothing in the record for anyone to objectively conclude that the officers had a reasonable fear for their safety. I think it's pretty clear that this is part of their policy. And I'm not going to get into the wisdom of that policy, but this is what they did. Let's pat you down. Johnson said, hey, I don't want you to pat me down. I don't want you to search me. And Broaddus stopped. That's when Broaddus and Johnson, excuse me, were standing face to face. Broaddus said, hey, what's that on your shirt? It's a flake of marijuana. Johnson said, that's a problem. Broaddus immediately has Johnson turn around and handcuffs him. Shortly after that, you hear Broaddus say, in talking with Johnson about the marijuana, that's illegal. Well, the fact of the matter is it's a civil offense. It wasn't a criminal offense. Wasn't also the traffic violation. Wasn't that a sufficient basis to arrest Johnson? That's where we get into the analogy to Knowles versus Iowa. Knowles was- Can you answer that question first? Because you say in your brief that you assume that he could be arrested. So I assume that such actions, this being arrested for traffic offense, were legally proper. So you agree that that was a sufficient basis to arrest him, correct? The traffic infraction provided a basis under Virginia law as tantamount to a basis for arrest, correct. I don't disagree with that. However, a traffic infraction at issue here, the reader light being out, is a class four misdemeanor. It's punishable by a fine. No jail time of any sort. It's the kind of thing similar to Knowles, where Knowles was stopped for a speeding violation, an infraction, and the court in Knowles said, you can't use citation to conduct a full-blown search, which is exactly what happened here. That's where we get into Gantz. Gantz says that when you search somebody- Well, but the basis was not the traffic infraction. It was the speck of marijuana that was found on his purse. That's a good point, Judge. And the court below, in dealing with that, decided that, oh, well, let's say that you can do a search incident to arrest before the arrest occurs, and we're going to make the arrest. I see I've run out of time. Go ahead, go ahead. Because you can arrest, conduct a search incident to arrest before an arrest if there is probable cause to support the arrest. And the lower court said that the infraction for which the arrest occurred was the traffic violation of the license plate reader light being out. The trial court said nothing at all about the marijuana, I think, implicitly recognizing that the fact that marijuana is a civil matter, not a criminal matter, does not provide probable cause for any kind of action by the police. Now, our case is a legion that, you know, whatever the district court does below, that we can affirm on any reason apparent in the record. So why isn't that a reason apparent in the record to affirm, even though the district court might not have relied on it? Right result for the wrong reason, Your Honor. Well, you know, that's- And that's where Your Honor is going. And my answer to that is this. With an arrest for the traffic infraction, how can you find evidence of that traffic infraction by searching Mr. Johnson's person? Gantt tells us you cannot. Gantt tells us that in the context of vehicular searches, if the person is within reach of the vehicle or the containers, and it's related to the offense of arrest, then you can proceed. Here, the offense of arrest is the traffic infraction, the tail reader light being out. Where are you going to find evidence of that? You aren't going to find it on Mr. Johnson's person. You are not going to find it in the bag that was around his body. A certain incident to arrest can always include looking for something that the arrestee could use to hurt an officer, to make an escape. It's not just for evidence of the crime. But again, Gantt tells us that when the person is secured and removed from the scene, removed from the vehicle, it doesn't apply. That's why the lower court said- That might be true if they were trying to search the vehicle incident to arrest, but that's not what they were doing. But Mr. Johnson's hands were handcuffed behind him. He was surrounded by uniformed officers who were all armed. With the fanny pack. I call it a fanny pack. I know they call it something different these days, but I'm old enough that it's a fanny pack. Sure. Right, but he had the fanny pack on. He did. And in fact, because Mr. Johnson was secured, the officers were physically holding him and they ended up cutting the bag off of him because he was secured. He had no way of getting to it. His hands were behind him. The fanny pack is in front of him and he is physically seized by the police officers. So he- He's physically unable to turn the fanny pack around. I mean, that's sort of the nature of a fanny pack. Correct. He could- I mean, to be clear now, I like a fanny pack as much as anybody, but this is a shoulder bag, right? So it's, he could, I mean, he could move that around. I don't know if we need to get into those facts, but you can move your body, right? That that moves around. But I think the point here is that he had a gun strapped to his person. And in Farrabee, we said a gun in a bag inside a house is close enough to an arrestee with his hands handcuffed behind his back because he could make a run for it and grab it. This is- Right? This gun is a lot closer than the gun in Farrabee was to the person who was handcuffed during the arrest. It's closer, but this is nothing like Farrabee. Here, Johnson was surrounded by police officers who were physically holding him. Well, I watched the camera. He had one officer who had a hand on his elbow, right? And then the other officer, when we're talking about approached him to do the, to search the bag, right? When the bag was searched and they did not do a pat down of the bag, such as in just Davis, where the officer is part of the pat down frisk actually manipulated the fanny pack. You think that's smart? Is it smart for an officer to pat down a bag they think might have a loaded gun in it? That's what they're supposed to do. It's not- Why? Why are they supposed to do that? As part of a pat down, you can't do a search. And opening up that bag is an invasive search of a container. Every court that I've seen to consider that says that you can open the bag to look in it to see if it's a gun. You don't have to try to see if you can pull the trigger by manipulating the bag. Well, that follows along the line of Belton, which can't roundly criticize. And in fact, part of the criticism- That's the car versus the person. He's got the gun strapped on him. And it's contained inside a bag. And Mr. Johnson was secured in such a way that there was no way that he could access that. In Davis, Davis had a backpack and it was on the ground. Davis had then been secured. The backpack was apparently within feet of him. And this court said that the search of the backpack was improper. Here, and the court in Davis was clear that searching those containers, if the individual is secured, they don't have access to it. If they have access, then yes, you can search. But here, Johnson was secured and there was no way that he could have had access to it. Wasn't Davis secured a little bit more than Mr. Johnson? Wasn't Davis face down on the ground with officers on him? Yes. And there was no Confederate who could come over and get the bag, unlike here with Mr. Miffin? But in Davis, there was only the one officer at the time. And Johnson, he was surrounded by at least three other officers who were standing right next to him. And again, Johnson was being physically held by other police officers. All right, thank you, Mr. Pickens. Thank you, Judge. Mr. McCormick. Morning, and may it please the court. Tim McCormick on behalf of Appellant Miffin. As indicated by my colleague, I'll be addressing the inevitable discovery issues. After finding the police could not search the vehicle as part of Mr. Johnson's arrest, the district court found the evidence both in the vehicle and on Mr. Miffin's person was nevertheless admissible. This was an error for two reasons. First, impounding the vehicle in a police lot was not inevitable, but rather a product of Officer Broaddus' discretion, which was informed by a legally obtained evidence. Second, even if the court applies- Wait, wait, which evidence? I'm referring to the evidence in the vehicle. I would say that- No, no, because you said that decision was informed by the legally obtained evidence, and I'm accepting your allegations of illegality, but are you claiming that it was informed by finding the gun and drugs on Mr. Johnson, or are you suggesting it's informed by the gun and drugs that your client had? Your Honor, we concur with the position of the co-defendant here that all of the evidence found- I understand that, but what I'm trying to say is, what do you think motivated... You said the illegal evidence is what made him change his mind. I'm not sure where that comes from, but I'm just trying to understand which illegal evidence you're referring to. Are you referring to the Johnson evidence or the Miffin evidence? They both got guns and drugs. All of the guns and drugs attributed to Mr. Miffin were found in the vehicle. So his decision to tow the vehicle was made after he had already searched it. That seems inconsistent with what the district court found. What the district court found is that he had the authority to search the vehicle and that this vehicle needed to be towed, but what officer brought it- Because it was inoperable, right? Because the tags suggested it was stolen or something. Under Virginia law, the district court found that the vehicle was legally inoperable, but what officer brought- And so at that point, the vehicle, the district court found under the policy would be towed and impounded. No, your honor. Well, they said that it was going to be towed, but that's our point here is that the fact that a vehicle is inoperable and is going to be towed does not necessarily mean that it's going to be impounded in a police lot. What officer brought us testified to is that- And wait, help me understand. Assume for a minute their policy was, we're going to take it to a third party lot? Yes, your honor. I think that- That in that instance, they are not permitted to do an inventory search before they turn over a vehicle to a private third party? My understanding of the inventory doctrine is that it's when the property becomes the, when they are taking ownership of the property from the person that it's taken from. So they're not taking ownership. I mean, nobody's taking ownership, right? I misspoke. Not ownership, but they're taking custody of the property that when you are seizing this property and bringing it to a police impound lot, you are effectively, you know, taking custody of it. If the vehicle is not necessarily, is not going to a police impound lot, we would say that it's not necessary for the police to conduct an inventory search. But that's not really the question, is it? Isn't the question what is the policy that applies in Enrico County? The policy- The policy is the officer testified that when we might be held responsible for, you know, what's in that car, because we are having it moved, then we have it searched. I don't- And you have to make an argument that that wouldn't apply to this car. Not that that may not apply to other cars in other cases, but that it wouldn't have happened here. Your Honor, what I would say is that the necessity for the police to take ownership or to, excuse me, to take custody of the property inside the vehicle only applies if it's going to a police impound lot. If the lot was going to, if an inoperable vehicle, say a vehicle just broken down on the side of the road, if it's not going to a police impound lot- What's the best authority? What do I want to look at to see that the inventory search is limited to when it goes to a lot that's owned by the police? Your Honor, no, that's actually one of the issues here is that when you look at- I know, I just wanted to- What you keep saying that the inventory search doctrine only applies when a car goes to a lot that is owned by law enforcement, government. I'm not sure, but what's the authority that I want to look at to see- What I'm looking at, in United States v. Matthews, this court held that the inventory searches must be performed- Can you just give me the site of that just so that I- 591 Federal 3rd 230. Anything else that I should look at for that limitation? I would say that- I'm not trying to question you. I'm just saying that seems like an odd rule. Maybe we have such a rule, but that seems like a quite unusual rule. I don't want to misstate what the court said in Matthews. What the court said in Matthews was that inventory searches must be performed according to a standardized criteria such as a uniform police department policy. Here- Right, but I'm asking a different question. That's why I'm- You say it only applies if the policy says this goes to a government lot. It has to be owned by the government, right? That otherwise, you can't do an inventory search. That seems inconsistent with what, in a former life, I recall happening. And so that's why I'm not aware of that rule. It might well be a rule. I'm just not aware of it, and I don't remember it from the briefing. And so I'm just trying to understand where am I looking to find the rule that the inventory search doctrine only applies when the lot to which the vehicle is towed is owned by the government? Your Honor, I would say that it's not up to this court to craft such a policy. It's up to the government to say what our policy- No, but ours is a Fourth Amendment question. You're saying the Fourth Amendment only permits an inventory search to occur when it goes to a government lot. What I'm saying is that doesn't seem right. You could have a different question, which is to say what they did was inconsistent with their policy, right? That's fine. But you said, or maybe I misunderstood you, that you can't have an inventory search if it's going to a lot and it's not owned by the government. What I'm saying, Your Honor, is that an inventory search has to go to one of these standardized criteria, and whether or not- And there's really no doubt that if a vehicle is going to a police lot and police are taking custody of that property, that they're going to inventory it. But common sense in our everyday experience will say, if it's not going to a police lot, if your car's just broken down on the side of the road and is in an operable vehicle, the police never have to take custody of it, and therefore they never do an inventory search. I'm not sure I understand that. So you agree that if the policy said that in this circumstance, we tow the vehicle and we tow it to a private lot, right? A third party's lot. But before we turn it over to the third party, we do a search of it because we don't want to turn over drugs and guns to a third party. That if that was the written po- I know this is not the written policy. If that was the written policy, you agree in that scenario that the inventory search doctrine would apply? No, sir. I would say that the purpose of an inventory search is that when the police are taking custody of a property, if they're never taking- One more time, and then I'll stop because we're over every time. What is the authority for that limitation on the inventory search doctrine? Is it Matthews? I mean, I will read them. I would say that it's the fact that there's not a stan- the fact that the government has offered a standardized- Not reason, authority. Like, is there any case? Is anybody, like, treatise, case, person, other, no disrespect to your views, but, like, is there an authority who suggested that that is a limitation of the doctrine? Your Honor, I'm not aware of a case that has expressly stated that. Mr. McCormick, even if you're right on the inventory search, if we find that the search of Mr. Johnson was proper and the narcotics that were found on his person along with the speck of marijuana was admissible and not a violation of the Constitution, wouldn't that have allowed a search of the automobile pursuant to the automobile exception to the requirement of a warrant? No, Your Honor. I think that the information available to the officers at that point, available to the officers at that point, does not give probable cause that there was going to be contraband, a criminal amount of contraband found in the vehicle. My colleague, I believe, is probably better suited to answer this. Had Mr. Johnson said that there would be contraband found, didn't he say that there was a marijuana blunt in the car? He said there was a marijuana blunt in the car, but as the- That seems like probable cause to me. Your Honor, I think that as Mr. Pickus pointed out, that it's not a, at the time, at this time, that was not a criminal amount of marijuana. There was a fleck of marijuana and a blunt was not, it does not constitute probable cause for a crime. I mean, so we would say that- He said that detecting marijuana, even the smell of it, can give an officer probable cause to think the car contained contraband. And we would say that here, that doesn't give rise to a criminal amount, to a criminal amount of marijuana. We're talking about a civil offense. Does that matter under Atwater versus City of La Vista? Does it matter whether it has been categorized as a fine only versus a prison offense? I understand the change that happened that July, but does that matter? Doesn't, for the Fourth Amendment purposes, doesn't it, I mean, I understand why that would make a difference. Right? Again, I think my colleague, Mr. Pickus, might be better suited to answer that question. Can I ask you one other question then? And you can also defer this one to your colleague if you like. Does it make a difference that there was probable cause to believe that federal law was violated because federal law outlaws all marijuana possession? Right, so the federal statute prohibits possession of marijuana in all 50 states? Your Honor, again, I think Mr. Pickus is the one who is probably better suited to answer those questions. If I may briefly summarize my second point, because it didn't quite get- Sorry, a little bit over, but make it move quickly. What I was going to say was that even if this court applies the inevitable discovery doctrine to the evidence found in the vehicle, that would not salvage the admissibility of the evidence found in Mr. Miffin's person. It's really undisputed that the location of the weapon and the drugs within the vehicle was what led to the arrest of Mr. Miffin. And we would say that if the vehicle, if the search of the vehicle was illegal, and even if it was going to be salvaged by the, but the admissibility of that evidence was nevertheless going to be salvaged by the inevitable discovery doctrine, that does not cure the defect for, that does not cure the defect. The derivative evidence in the form of the evidence found in Mr. Miffin is still tainted, and the inevitable discovery doctrine would not salvage it. All right, thank you, sir. Thank you, Your Honor. Mr. Anthony. Good morning, Your Honors. May it please the court. I am Stephan Anthony on behalf of the United States in this case. On September 1st, 2020, Officer Broadus of the Henrico County Police Department twice came into contact with Appellants Johnson and Miffin. And the first encounter was a consensual encounter that led to no discovery of evidence. But more importantly, the second encounter was a traffic stop, which is why we're here today. And so for that reason, there's three points that the United States wants to highlight in this particular argument. First, that Officer Broadus had reasonable suspicion that Johnson was armed and dangerous, justifying the pat-down of him and the bag which he wore across his person. Secondly, in the alternative that Officer Broadus searched Johnson and the bag he had on his person pursuant to a search incident to arrest. And then lastly, Officer Broadus reasonably searched the vehicle in which Johnson and Miffin rode, and therefore did not improperly extend the stop of either Johnson nor Miffin in this case. First, with respect to the pat-down of Mr. Johnson and the pat-down or search of the bag which he wore across his person, the District Court emphasized several reasons why Officer Broadus has a reason to believe that Johnson was armed and dangerous. Can you respond? So assume for a minute that I agreed with that. Can you respond to your colleague's suggestion that even with reasonable suspicion, he was not permitted to open the, what do we call it? What's it supposed to be called? It's a shoulder bag. Shoulder bag, sorry. Cross body, maybe. Yeah, the cross body fanny pack. I call it a murse. Right. A murse. Whatever it is, right? The bag that's on his person. Sorry, I showed my age. But I'm just gonna call it a fanny pack if I can't get anything else out, right? So, but that he was, even with reasonable suspicion that he was armed and dangerous, all that permitted him to do was to play around with the fanny pack that he couldn't unzip it and look in it. I mean, that's the, as Judge Rushing suggested, that seems like a dangerous rule for us to have, but is that the rule? If we assume that you had probable cause or can in the context of a bag like that, can they just open it up and look in it to determine if a firearm is there? And Judge, I believe you alluded to the fact that every court that has touched on that issue has not made that the rule. Instead, opening the bag would be reasonable. And we cited in our brief, I believe it was United States versus Walker, which is a Sixth Circuit, 2010 case, where the court specifically said, as Judge Rushing reason, it's not very smart to go manipulating a bag with your hand that may have a loaded gun in it, that you suspect has a loaded gun in it, because you might endanger yourself as an officer or the folks around you. So is that different from somebody's pocket, right? So we have seen to suggest, unlike in the bag context, we have seen to suggest that, it's called a Terry Frisk for a reason, right? That it's a frisk. And that if you feel something on somebody's pocket, you can then investigate further if it's a hard object, but that it would be improper to put your hands in somebody's pocket without feeling them first. And I think, Judge, it might be a sliding scale depending on the information the officer has at the time. For example, if an officer is able to see the outline of what looks like a gun in a person's pocket, again, it might- They wouldn't have to do a frisk in that time. It might not make- But they don't see an outline in this bag, right? Why might those look different, right? You might only be able to pat somebody's torso down, but you might be able to unzip a bag and look in it, maybe without rummaging around too much, or maybe there's some limits on it, but how do we sort of square those two ideas, that the frisk of the torso, but I can at least open the bag to look in it? And going along the same lines, not necessarily saying an outline in this case could be visible to the officer, but I think in any situation where you're going to manipulate a object or a bag, there has to be a certain sliding scale between what the officer can detect and what the officer's gonna risk in doing that. And I think this bag is actually attached to the person, right, so manipulating that bag where it might have a loaded gun in it can obviously cause very serious consequences to the defendant, not to mention others around. And that sometimes is the case too with pockets, but I think you might be looking for more of an outline if you try to touch somebody's pockets, as opposed to a bag that's strapped across the chest, which obviously can cause wounds in that area. But going back to the district court and the reasons for believing that Johnson was armed and dangerous, there are several factors. First of all, the background checks that Officer Broaddus was able to do both on defendant Johnson, defendant Miffin, and on the vehicle in which they rode. So you have Johnson, who was on federal probation at the time, you have Miffin, who was a member of a Crips street gang, and then you have the vehicle itself, which had tags which did not come back to that vehicle, leading the officer to the suspicion that that vehicle might actually be stolen. So taking all of those three things together, the officer can conclude that one, we have a person who's- Does it matter that the officer sort of seemed, in the first initial encounter, that the officer seemed to disregard this concern about a stolen vehicle, right? And he noticed something was funky with the tags the first time and didn't go further, does that matter? It matters only in the sense that it shows that the officer was trying to be as reasonable and as less intrusive as he could be. In this situation, when he first encountered that vehicle in, I believe, one of the apartment building or complexes, he drove past fairly quickly, he got a sense of what the license plate was, he put that license plate into his system and got back information that it might be attached to the wrong vehicle. But as he testified, he wasn't sure at that point that he even put the license plate in correctly. So what he did was he got out, he spoke to the individuals in the car, I believe initially it was just Mr. Miffin and then Mr. Johnson comes out later, but he didn't pry at that point. There was no reason for him to do so. He had suspected that that might be an issue of potentially a burglary happening because the interior lights were left on, but his suspicions were quelled by speaking to Johnson and Miffin over the course of approximately 30 seconds and he left it alone. It was only a coincidence that 20 minutes later or so, he gets behind the same vehicle and notice it has a license tag out and then proceeds to do the traffic stop. Again, apart from the background checks that Officer Broadus had conducted against Johnson and Miffin in the vehicle, he was also under the, was informed by Sergeant English. As Sergeant English came up to assist in the traffic stop, there was a lot of movement going on in the vehicle by the driver. And while Sergeant English didn't describe that movement in great detail to Officer Broadus, what Officer Broadus testified to and if Sergeant English as well, is that there was such an abrupt change in Sergeant English's demeanor as he was standing at Officer Broadus's window speaking to him about what was going on. That they were having a conversation then abruptly, he just walked off and said, there's a lot of movement. And what the district court said is, she interpreted that as to be out of the norm movement. And that certainly heightened Officer Broadus's suspicions and gave him reason to add to the other things he had from the background checks to say, this might be an armed and dangerous situation. Now, what my colleague has said is, some of the video doesn't correspond onto what Officer Broadus testified to. And I would just emphasize that I don't believe that that's what actually is shown in the video. You don't hear Officer Broadus saying, oh my goodness, I'm in fear of my safety now, this is what I'm going to do. But officers don't typically do that. They assess the situation, they might communicate with each other, but they assess the situation as a whole and then make an objective or try to make an objective determination as to what to do next. And then the standard obviously is objective as to what a reasonable officer would do in that situation, whether they would conclude this was a situation where the defendant was armed and dangerous. And so taking those things in addition to some of the other factors identified by the district court, the district court was properly concluded that Officer Broadus had a reason to believe that Johnson was armed and dangerous and therefore get him out of the vehicle and conduct a pat down. Now there is some distinction we need to draw between what was called the initial pat down by the district court and what I'm going to refer to as the actual pat down. When Johnson gets out of the vehicle, Officer Broadus asks him, can I pat you down for weapons? And you see on the video, Johnson raised his hands and slightly turned away from the officer as to seemingly submit to a pat down. And Officer Broadus then starts to go around the front of his waist. And then suddenly you have Johnson say, no, I don't want you to pat me down. And he turns and faces the officer. And Officer Broadus interpreted that as sort of a squaring up of Mr. Johnson at that point, which he took as perhaps a act of aggression. And so he begins to look towards his waistband and up and down his shirt and he sees the speck of marijuana. That particular pat down, if that is a pat down, did not produce any sort of evidence which would have been admitted at the trial of Johnson or Miffin. So what I would refer to as the actual pat down is what- So is your position on the initial pat down is one, they had reasonable suspicion that he was armed and dangerous at that point. And so the pat down was permissible under Terry. Yes, sir. And two, or maybe alternatively, that his actions were effectively consent. Yes, sir. Which he then withdrew by saying, nope, I don't want you to do it. And then at that point, we get to the pat down two. Yes, sir. And just in all candor, the district court determined that that was not consent. I believe she said in a footnote, but nevertheless- No, no, I understand that that's not what the district court concluded, but I'm just trying to understand your position. Yes, sir. And then so we then get to the true pat down or pat down two, which occurs after Johnson is placed in handcuffs and the bag again is strapped across his shoulder, whether it's a fanny pack or a purse or whatever it is. And we get to the point which the court has already mentioned about whether the manipulation of the bag or the opening of the bag was proper. We stand by the point that opening the bag in that context where the bag is across his body was a proper act. Now, why would we ask for this court to justify opening a bag when Johnson was handcuffed? I believe in this court and just Davis, and I believe Ferebee as well, talked about a situation where the bag or the container was actually apart from the defendant when it was searched or when it was actually opened up. But nevertheless, the court confirmed  And I believe the justification was a distinction between say Buster and Davis, which was when the defendant was actually either on the ground or completely removed from his property and had no chance to get back to it. In those situations, this court has said a search of a bag or a manipulation of the bag is not proper. Can I ask you about just Davis? Because at first I thought that was pretty similar and it's on a reasonable suspicion, not on search incident to arrest. But there, the officer had reason to think this man was armed and dangerous, but it partially was because of a Facebook post where he said, more or less, I have a gun at this fair or carnival amusement park, whatever it was. And then the officer did the pat down of the fanny pack in that case before opening it up. And we didn't draw lines. We didn't say you have to pat it down or, but we also didn't go as far to say every time there's a Terry stop where you think the person's armed, the officer can open their bags. And would we have to go that far here? Would we, to authorize this under reasonable suspicion as a Terry, you know, frisk of the bag, would we have to say, anytime you have a Terry stop and you think the person's armed, you can open their bag? I don't believe you wouldn't necessarily need to go that far, Judge. I think, again, the particular circumstances of where the bag is located, essentially attached to the person matters. I think all of the other factors which informed the officer brought us his conclusion that this person was armed and dangerous might not be present in every case. So you might be able to draw some distinctions there. So I think at least on those two grounds, you can distinguish this case from others potentially, and therefore not have to go as far to say, anytime a person has a bag and there's a Terry situation, you can go into the bag. Some of that, some of what distinguishes this case, I guess what I'm struggling with is, some of what distinguishes this case in my mind is what pushes it towards search incident to arrest, right? That there seemed to me to be plenty of evidence to arrest Mr. Johnson, whether it was for the traffic infraction or possession of marijuana, all right, that that leads to a different kind of calculus. But you say there's a line we can draw just on the Terry interaction itself. And what is that? Again, I think it would be the particular circumstances of this case in terms of where the bag is located. Again, going back to, I think it was Buster and Davis. So when a person has, when they're carrying a bag. When they're carrying a bag. And an officer has reasonable suspicion. Yes, ma'am. That there's criminal activity afoot. Yes, ma'am. And the officer thinks the person might be armed. Officer can always open the bag on the person. Can always open their purse or their backpack. And I think there might even be a distinction between whether you always open or sometimes manipulate depending on the circumstances. Again, a person carrying a bag, say over the shoulder, but no handcuffs. But in this case, you have a person carrying a bag across the shoulder with handcuffs. And the only way to get it off of them would either be to cut it off or to unhandcuff them. In that situation, which is the situation here, I think opening the bag would be proper under Terry or a search incident to arrest it. Can I ask you a question about that? I don't know how familiar you are with these bags, but it seems like to me, unlike a backpack, which like you couldn't shimmy around like a fanny pack across your shoulder. I mean, if I wasn't handcuffed, obviously I can just shimmy it around. Was there a suggestion that this was a fanny pack that was in the front, but even while handcuffed, he could manipulate it around to his back? It certainly was manipulable. It's a strap that you could- It's like a fanny pack, I know. So, yes. So yes, he could have manipulated around to the back where his hands were handcuffed. That certainly was an option. I mean, it might look different in a context where, for example, he was handcuffed in front, but he had a backpack on, which he was unable to get to his hands. Or if it's a purse and they're handcuffed, by almost definition, the purse, I guess if it's a shoulder purse, then it looks like a fanny pack. But if it was a purse that was in the hand, would have had to have been put down at that point. And then you get into the question of whether they're separated or not. It seems like it's a little unique to this type of a bag that's on your chest that is able to be manipulated. I think that's true. And also, if you consider, as we're positing at this point, that this is a Terry stop, a Terry situation, there's a chance that this guy's gonna be taken out of handcuffs and either allowed to leave or otherwise allowed to remain by himself at some point. And so, if you don't have a Terry frisk of this bag, then you obviously have a sustained, continuing threat to the officer because he doesn't know what's in it. If you unhandcuff him, that's your ball game. Moving, Judge, while I have a few minutes left to the question of the search of the vehicle, I think there's a couple of different ways which you can justify that. Because my friend has talked about the inevitable discovery, I'll just go there. What Officer Broad has testified to and what the district court ultimately found is that A, this vehicle had improper tags and therefore could not be driven on the streets of the Commonwealth. B, that the tags, because they were misplaced or mismatched, had to be removed and therefore the vehicle could not be operated on the streets of the Commonwealth. And leading from those two conclusions was the conclusion that the vehicle was going to be towed off of that street at that particular time of the morning. I don't quite subscribe, or I don't subscribe at all to the question of whether it's a third party, a lot, or a police lot. The obvious point is that Officer Broad has testified about what it takes or what is entailed in an inventory search. And that's at Joint Appendix 130, line 12 through Joint Appendix 132, line two. And he goes through those prerequisites to towing the vehicle and then talks about specifically what an inventory search entails. And he talks about any time the law enforcement is taking control of a vehicle and they are therefore responsible for what's contained therein, that they're gonna do an inventory search. And I asked him specifically on direct, does that include the center console? He says, yes. Does that include looking under seats? He says, yes. Does that include looking through containers or bags in the vehicle? And he says, yes. And all of those places are places where they found contraband in that vehicle. And so this wasn't a situation where the officer is somehow lacking good faith or going outside of what would normally be an inventory search. What Officer Broaddus did in this case was specifically in line with what was an inventory search. I'm gonna ask you a question about that. So if the basis for this search of the vehicle is the inventory exception, how, if at all, does that affect the officer's subsequent search of Miffin, right? Because if it's an inventory search, it would not have gotten the contraband out of the car until it was actually searched at the location of the parking lot, and therefore would not have had any basis to search Miffin or detain him because they don't find any evidence until later in the process. How does that affect Miffin? Well, I don't think we have to cross timelines, particularly in this situation. Inevitable discovery means you would have discovered it later, but you still discovered it at the time that you discovered. So they discovered the evidence at the time of searching the vehicle on the side of the road, which led them to Miffin. I don't believe the court has ever, or has ever deigned to say, because this evidence under inevitable discovery wouldn't have been discovered until sometime later in the day or the evening, that you can't therefore include derivative evidence from that search in your trial. So I don't think the court has to necessarily get to that point of crossing timelines to try and make that fit. All right, thank you very much, Mr. Anthony. Mr. Pickus, you've got some rebuttal. Please, the court. Excuse me. Anytime the police open up a container when they have stopped an individual and they look inside that container, it is a search, period. Here, there was an attempted pat-down to which Mr. Johnson objected. When he objected, when he withdrew his consent, Officer Broaddus stopped. Johnson turned around, Broaddus saw what he described as a fleck of marijuana, directed at that point, Johnson to turn around, put his hands behind the back, and Johnson was cuffed and then moved off to the side. His hands were cuffed behind him, and as apparent from the body cam video, the shoulder bag, fanny pack, however you wanna describe it, and I tend to agree with Judge Rushing that a fanny pack description is wrong because a fanny pack infers that it is a container that is secured by a rope or a string or a strap that is secured around one's waist. That was not the situation here. It was more as if you see some person walking down the street with a shoulder bag where the strap crosses over top of one shoulder, goes across their body, and slings around underneath the other arm. That was the situation here. That's the manner in which this bag was carried. In just Davis, the police had been monitoring social media, their Street Crimes Task Force, and I think I'm mislabeling that, had identified Just Davis, and they were on the lookout for him because of his social media posts. They saw him in a description that matched what he had posted on social media. The police officers immediately came up to him. They started patting him down, including manipulating the outside of his shoulder bag, fanny pack, however you describe it. Minnesota versus Dickerson gives you the plain feel exception to the warrant requirement. That basically says that when you feel something that you can immediately identify as contraband, then you can open up the container. And in Just Davis, the officer did such a manipulation as part of her pat down of Just Davis. Only after she identified a hard solid object was Just Davis arrested, and she then opened up the bag as part of the search incident to arrest. That is not the situation before the court today. The situation before the court today is that Mr. Johnson was cuffed with his hands behind his back. He was being clearly detained for a traffic infraction that had nothing to do with anything that would be on his person in a fanny pack inside the vehicle. He was removed from the vehicle. In fact, the trial court said that the search of the vehicle itself was unconstitutional. The only reason why the search was upheld in the trial court was because the trial judge felt that the contraband in the car would have been inevitably discovered. That might be wrong, right? We asked your colleague here about searching the car based on the admission that there was marijuana inside or based on the fact that having seen some marijuana, the officers could know that it's prohibited, at least by federal law. Do you have a response to that? I do, Judge Rushing. This was a state case initially. State police officers enforcing state law. And I would note to the court that federal prosecutions of marijuana laws have been prohibited because there's no funding for it. That's why there haven't been these prosecutions of simple possession. We allow search of a car, for the automobile exception, to look for contraband. And so in Virginia, marijuana was still contraband, even if you could only be fined for having a small amount of it. So how does that get you anywhere? Someone's admitted there's contraband in the car or there's some on his shirt, which gives them reason to think there's more contraband in the car. And that leads to the auto exception, doesn't it? Respectfully, Judge Rushing, I would very much disagree with the court's characterization as marijuana being contraband at that point. Perhaps two years before that, yes. Two years after that, absolutely not. At the time of this stop in September of 2020, simple possession of under an ounce of marijuana was a civil matter, not a criminal matter. Right, it's a civil matter. It's contraband, even though you can't be prosecuted and put in jail for it, doesn't mean it's not contraband, right? I would disagree with that characterization. And the fact that John had admitted that he had a blunt in the car could give the officer reason to think there might, in fact, be more than was admitted.  but that there could be more in there. That's a possibility, but that doesn't appear to be the reason for the search. And as far as an inventory, there's an inventory search is supposed to be pursuant to specific promulgated guidelines. But I'm talking about the automobile exception to the warrant requirement. I'm saying the district court might've been wrong that this was an unconstitutional search and she needed to rely on the inevitable discovery. I think that goes back to Gantt where what they're searching for was the offense of arrest. The offense of arrest was for the license plate reader light. Again, that's based on what the district court said, but the district court didn't think about this marijuana and didn't consider that. Well, the court did and dismissed that because that evidence was before the trial court and the trial judge found that that wasn't the justice location for the search. No, I don't believe that the court made a finding about that. The court didn't want to consider his statement before he was Mirandized. And so just avoided the issue by relying on inevitable discovery. But the fact that he hadn't been Mirandized when he said there's a blunt in the car doesn't make what they find after looking in the car through the poisonous tree. We've said that in other cases. But again, it's not a criminal matter. And because it's not a criminal matter, it's not contraband and it doesn't supply probable cause. It doesn't supply reasonable suspicion. In this case, when- Can you just comment at least a little bit on the idea that it is illegal under federal law to possess marijuana in all 50 states? At the moment it is- Which means under federal law, it is contraband, right? Like that's a question that ought to be beyond debate. It is beyond debate. But what we get into is competing interests between different sovereigns. We have a state sovereign, which has created its own laws to govern the conduct of its citizens. We have a federal sovereign, which has its own set of rules and procedures and laws. But what we have here is you're getting into, and I must confess I'm not well-versed on the silver platter doctrine, but in essence, what you're doing is setting up to allow state actors to violate any kind of state laws or constitutional provisions, as long as there can be a saving grace under federal law. And I don't think- What are they violating? What state constitutional provision or law did they violate? Well, it's under the federal constitution, fourth amendment rights. Right, but you just said something different. You just said, we can't let state officers violate the state constitution and state law because marijuana is prohibited under the federal law. Well, the- What's the violation under state law that you're talking about? Well, there are state constitutional protections against illegal searches and seizures. Okay, so that's not what we're talking about here. And it, well, it's the same theory, the same ideas. The constitutional section numbers and amendment numbers are different, but they're all crafted and based upon the same basic idea that there are some things that law enforcement acting on behalf of the government cannot do to the citizens. You cannot search somebody's home just because you want to. You have to have either consent or a warrant. The same thing with searching a vehicle, whether it's under state law, state constitutional provisions or federal constitutional provisions, the ideas are still the same. And to say that this is allowable under federal law is to basically be saying, okay, Henrico County Police, City of Richmond Police, Chesterfield County Police, as long as there's some saving provision under federal law, you can do what you want. Somebody you think is smoking marijuana, go arrest them. Even though it's not a crime under state law because you have a safe harbor under federal law, we'll let you do that, no matter that it violates their Fourth Amendment rights. And I don't think that's what this court has ever sanctioned in the past. I don't think it's something that this court should sanction in the future. All right, thank you, Mr. Pickles. Thank you, Your Honors. Dean, we were supposed to finish at 1130 and we're behind schedule. So I think the best thing for us to do is adjourn court and we'll conference and we'll get the questions answered in the afternoon if that's okay with you. That'd be just fine. All right, Mr. Pickles and Mr. McCormick, I'd note that both of you are court appointed. We, again, are very appreciative of the good work you've done on behalf of your clients here today. And as I said earlier, could not do the work that we do without lawyers who are willing to take on these cases. So on behalf of a grateful court, we thank you. And Mr. Anthony, we thank you as well for your fine argument. We'll come down and re-counsel and adjourn court for the day. Dishonorable court stands adjourned. Tiny die, God save the United States and dishonorable court. Thank you. Thank you.
judges: Albert Diaz, Julius N. Richardson, Allison J. Rushing